## UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF TENNESSEE

## NASHVILLE DIVISION

| | |
|---|---|
| JULIA ASKINS, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DOLLAR GENERAL CORPORATION, TODD VASOS, and JOHN GARRATT,<br><br>Defendants. | No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

Plaintiff Julia Askins ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, alleges in this Class Action Complaint for Violation of the

Federal Securities Laws (the "Complaint") the following upon knowledge with respect to her own acts, and upon facts obtained through an investigation conducted by her counsel, which included, inter alia: (a) review and analysis of relevant filings made by Dollar General ("Dollar General" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the Internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired Dollar securities between March 10, 2016, and November 30, 2016, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Dollar General is one of the largest discount retailers in the United States, offering a large selection of products, including consumables. As of February 26, 2016, Dollar General managed 12,575 stores located in 43 states.

3.      Dollar General's business model is fairly simple. Dollar General attempts to offer general merchandise, basic everyday items and households' needs at a discount price based upon continuous evaluation of needs and demands. Dollar General identifies itself as a "low-cost" operator. As such, Dollar General's customers are low and middle income households.

2

4.     Numerous Dollar General customers are eligible to the Supplemental Nutrition Assistance Program ("SNAP"). The program allows low income, senior citizens, disabled and others to receive electronic benefits usable as cash to purchase food.

5.     Starting in 1996, SNAP benefits contained a limitation that only allowed unemployed individuals, who are not disabled or raising minor children, to receive SNAP benefits if they were unemployed for less than three months out of a thirty-six (36) month period. Thus, able-bodied adults without dependents could only receive SNAP benefits for a maximum of three months.

6.     In 2008, in reaction to the financial crisis and the beginning of a recession period, states started waiving this limitation, some with the intent of re-implementing it once the U.S. economy recovered.

7.     In 2016, about 20 states planned on re-instituting the three-month limit, effective for the second fiscal quarter of 2016. As a result, an estimated one million SNAP recipients would see their benefits terminated.

8.     The Company made materially false and/or misleading statements, misrepresenting the potential impact of the SNAP reduction on Dollar General's operating business and financials.

9.     As partial truth about the impact of the re-institution of the time limitations on SNAP benefits on Dollar General's business operations was revealed, Dollar General's stock price declined $16.18 per share, or more than 17%, from a close of $91.79 per share on August 24, 2016, to close at $75.61 on August 25, 2016.

10.     As the full truth was revealed on December 1, 2016, Dollar General stock price declined $3.84, or nearly 5%, from a close of $77.32 per share on November 30, 2016, to close at $73.48 per share on December 1, 2016.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the

Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiff purchased Dollar General securities within the Class Period and, as a result, was damaged thereby. Plaintiff's certifications evidencing her transactions is attached hereto as Exhibit A.

16.     Defendant Dollar General is a Tennessee corporation headquartered in Goodlettsville, Tennessee. Dollar General common stock trade on the New York Stock Exchange ("NYSE") under the symbol "DG." The Company's headquarters is located at 100 Mission Ridge, Goodlettsville, Tennessee 37072.

17.     Defendant Todd Vasos ("Vasos") is and was throughout the Class Period the Company's Chief Executive Officer ("CEO").

18.     Defendant John W. Garratt ("Garratt") is and was throughout the Class Period the Company's Chief Financial Officer ("CFO").

19.     Defendants in Paragraphs 17-18 are collectively referred to herein as the "Individual

4

Defendants."

20.     Each of the Individual Defendants:

    a)     directly participated in the management of the Company;

    b)     was directly involved in the day-to-day operations of the Company at the highest levels;

    c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    e)     was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    f)     approved or ratified these statements in violation of the federal securities laws.

21.     Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Dollar General's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

22.     As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the

Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Dollar General's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

24. Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Dollar General securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Dollar General's business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase Dollar General securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Dollar General is one of the largest discount retailers in the United States, offering a large selection of products, including consumables. As of February 26, 2016, Dollar General managed 12,575 stores located in 43 states.

26.     Dollar General's business model is fairly simple. Dollar General attempts to offer general merchandise, basic everyday items and households' needs at a discount price based upon continuous evaluation of needs and demands. Dollar General identifies itself as a "low-cost" operator. As such, Dollar General's customers are low and middle income households.

27.     Numerous Dollar General customers are eligible for SNAP. The program allows low income, senior citizens, disabled and others to receive electronic benefits usable as cash to purchase food.

28.     Starting in 1996, SNAP benefits contained a limitation that only allowed unemployed individuals, who are not disabled or raising minor children, to receive SNAP benefits if they were unemployed for less than three months out of a thirty-six (36) month period. Thus, able-bodied adults without dependents could only receive SNAP benefits for a maximum of three months.

29.     In 2008, in reaction to the financial crisis and the beginning of a recession period, states started waiving this limitation, some with the intent of re-implementing it once the U.S. economy recovered.

30.     In 2014, Dollar General's then-acting CEO Rick Dreiling, during a conference call to discuss the Company's financial and operating results for the third fiscal quarter and nine-months ended October 31, 2014 discussed the importance of SNAP on the Company's core customers. Even then CEO Drieling recognized that SNAP Benefits impacted Dollar General's business. Then CEO Dreiling stated in relevant part:

"While on paper, it appears that the economy is improving, *the low to middle income consumer who is our core customer continues to look for ways to manage her budget as she works to prioritize her spending and she trusts that we are on her side to help her stretch her budget. Keep in mind, she had a tough fourth quarter last year with the number of headwinds that are starting to moderate year-over-year, including SNAP benefit reductions, challenging weather, higher energy costs, reduction in unemployment benefits and the lingering effects on consumer spending from the 2% payroll tax increase in 2013.*

As I reflect on our trends for the year, *I believe that we underestimated the impact of these cumulative headwinds on our customer*. As a result, there is no doubt that affordability is and will continue to be a focus of our core customer. Our renewed focus on $1 to $5 items continues to gain traction. We had more than 75% of our SKUs or 78% of our sales for the third quarter that were items priced at $5 or less. This is important as we know we trade more customers with the $1 fixed price retail concept than any other small box retailers. Beyond that, we are continuing to add items with approximately 80 SKUs under our smart and simple brand at entry level price points across 26 merchandise categories.

Emphasis added.

31.     From 2014 to 2016, about 20 states planned on re-instituting the three-month limit, effective for the second fiscal quarter of 2016. As a result, an estimated one million SNAP recipients would see their benefits terminated.

## Materially False and Misleading Statements Issued During the Class Period

32.     The Class Period begins on March 10, 2016, when Dollar General issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing the Company's financial and operating results for the fourth fiscal quarter ended January 29, 2016 ("March 2016 Press Release"). For the quarter, the Company reported a net income of $376 million, or $1.30 per diluted share, compared to a net income of $355 million in the previous year's comparable quarter. The March 2016 Press Release also touted that the Company had increased same-store sales by 2.2% during the fiscal quarter. The March 2016 Press Release stated in relevant part:

- **Full Year Net Sales Increased 7.7%;** *Full Year Same-Store Sales Increased 2.8%*

- **Fourth Quarter Net Sales Increased 7.0%; Fourth Quarter Same-Store Sales Increased 2.2%**

- **13% EPS Growth for Fiscal 2015; Fiscal 2015 EPS of $3.95 and Adjusted Fiscal 2015 EPS of $3.96**

- **Company Outlines Long-Term Financial Growth Model**

- **Company Plans Share Repurchases of Approximately $1.0 Billion in Fiscal 2016**

GOODLETTSVILLE, Tenn.--(BUSINESS WIRE)-- Dollar General Corporation (NYSE: DG) today reported record sales, net income and diluted earnings per share ("EPS") for its fiscal 2015 fourth quarter (13 weeks) and full year (52 weeks) ended January 29, 2016.

"2015 was another great year for Dollar General as we achieved strong financial results with a focus on profitable sales growth. For the 26th consecutive year, we delivered positive same-store sales growth. In the fourth quarter, we effectively balanced sales and operating profit through our toughest quarterly comparison of the year to deliver record results leading to full year diluted EPS growth of 13%,'" said Todd Vasos, Dollar General's chief executive officer.

"Looking ahead, Dollar General continues to have significant opportunities for growth. ***The goal of our long-term growth model that we announced today is to drive 11% to 17% total annual shareholder return per year through EPS growth and dividend yield***. Considering the financial results we have delivered over the last three years and consistent with how we are managing the business, our growth model is focused on increasing long-term shareholder value by driving profitable sales growth, capturing growth opportunities, enhancing our position as a low-cost operator and investing in our people. For 2016, we plan to return approximately $1.3 billion to shareholders through anticipated quarterly cash dividends and consistent share repurchases."

Vasos continued, "The Company remains well-positioned to serve our customers with value and convenience. We continue to take the appropriate strategic steps to ensure that we are investing in the Company for sustainable and consistent growth."

<u>**Fourth Quarter 2015 Highlights**</u>

The Company's net income for the 2015 fourth quarter was $376 million, or diluted EPS of $1.30, compared to net income of $355 million, or diluted EPS of $1.17, in the 2014 fourth quarter.

Net sales increased 7.0 percent to $5.29 billion in the 2015 fourth quarter compared to $4.94 billion in the 2014 fourth quarter. Departments with the most significant increases in net sales were candy and snacks, perishables, tobacco, and food. Same-store sales increased 2.2 percent, resulting from increases in both customer traffic and average transaction amount. Same-store sales increases were driven by strength in both the consumables and the non-consumables categories. In the consumables category, growth was driven primarily by candy and snacks, tobacco and perishables.

Growth in the non-consumable category was broad-based with notable strength across seasonal and home, offset by a modest decline in apparel.

*　　*　　*

**Financial Growth Outlook**

The Company has established a financial growth model that is focused on long-term shareholder value creation. Key components of the model include:

| **Key Drivers** | **Annual Target** |
| --- | --- |
| Net Sales | +7 to 10% |
|   -  Square Footage | +6 to 8% |
|   -  Same-Store Sales | +2 to 4% |
| Operating Profit | +7 to 11% |
| Diluted Earnings per Share | +10 to 15% |
| Cash from Operations | 7 to 8% of Sales |
| Capital Expenditures | 2 to 3% of Sales |
| Annual Shareholder Return (EPS Growth + Dividend Yield) | +11 to 17% |

For the 53-week fiscal year ending February 3, 2017 ("fiscal 2016"), the Company expects the 53rd week to contribute approximately 200 basis points to its net sales performance and $0.09 per diluted share to EPS.

***Including the impact of the 53rd week, the Company expects its fiscal 2016 net sales and diluted EPS results to be at the high end of the ranges outlined in the growth model above. Same-store sales growth for fiscal 2016 is forecasted to be near the middle of the range as outlined in the growth model above.***

The Company plans to open approximately 900 new stores and relocate or remodel 875 stores in fiscal 2016. Capital expenditures for fiscal 2016 are expected to be in the range of $550 million to $600 million.

***The Company intends to update its diluted EPS guidance only if the Company no longer reasonably expects diluted EPS to fall within the 10 percent to 15 percent range outlined in the growth model above.*** The Company does not intend, and specifically disclaims any duty, to update its expectations regarding where in the

range of guidance fiscal 2016 net sales, same-store sales or diluted EPS may fall, or to update any component of the growth model outlined above, other than diluted EPS as specified herein. The Company also does not intend, and specifically disclaims any duty, to update its dollar range for expected fiscal 2016 capital expenditures unless otherwise required by applicable securities laws.

The Company intends to use the financial growth model in discussions of its business beginning in 2016 and in future years, and by doing so the Company does not undertake to update any portion of the growth model except as specified herein.

Emphasis added.

33.     On March 12, 2016, the Company held a conference call to discuss the Company's financial and operating results for the fourth fiscal quarter ended January 29, 2016. During this call, Dollar General's CEO Vasos responded to a question from analyst Meredith Adler concerning SNAP benefits. Vasos stated in relevant part:

**Meredith Adler - Barclays Capital, Inc.:**

Okay, great. And then just a quick question about SNAP, which I know is not a huge piece of your revenues. But I think the FDA is talking about making some changes to qualifying for SNAP. And I'm wondering if you guys are looking at that and kind of what you think that means for your business.

**Todd J. Vasos - Chief Executive Officer & Director:**

Yeah, Meredith, yeah, we are watching that and we – *as you know and you mentioned earlier, SNAP for us is approximately 5% of our sales. So it really has – it's not a huge piece of the business but yet our core consumer does rely on SNAP benefits in a lot of cases.* But in saying that, the great thing here about Dollar General and we'll continue to monitor it, is that we offer her a great value proposition at the price. So whether she's pinched a little bit with SNAP or not, she can definitely come here to Dollar General and get all her needs. And we'll continue to deliver on that promise to her because she actually comes to us to make sure we can deliver on it.

Emphasis added.

34.     On March 22, 2016, Dollar General filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and year ended January 29, 2016 ("Q4 2015 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. Throughout the Q4 2015 10-K the company reapproved the previous

statements.

35.     On May 26, 2016, Dollar General issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the first fiscal quarter ended April 29, 2016 ("May 2016 Press Release"). For the quarter, the Company reported a net income of $295 million, or $1.03 per diluted share, compared to a net income of $253 million in the previous year's comparable quarter. The May 2016 Press Release also touted that the Company had increased same-store sales by 2.2% during the fiscal quarter over the same fiscal quarter in fiscal 2015. The Company, however, did not disclose any information about the impact of the re-institution of time limits on SNAP benefits on its operational business.

36.     The same day, Dollar General filed a Form 10-Q with the SEC announcing the Company's financial and operating results the first fiscal quarter ended April 29, 2016 ("Q1 2016 10-Q"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. Throughout the Q1 2016 10-Q the company reapproved the previous statements.

37.     The statements in paragraphs 32-36 above were false and/or misleading as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, these statements were false and/or misleading statements and/or failed to disclose that: (i) a significant percentage of Dollar General's EPS growth was tied to revenues derived from SNAP benefit recipients; (ii) the reinstitution of time limits on SNAP benefits would impact Dollar General's operating business and financials, particularly the Company's fiscal 2016 EPS guidance and same-store growth estimates; (iii)  56 percent of Dollar General stores are located in states that re-implemented the time limitation on SNAP benefits; (iv) the announced benefit reductions would have a disproportionate impact on the  Company's sales relative to the overall percentage of sales derived from SNAP payments; and (v) as a result of the foregoing, the Company's financial statements, as well as Defendants' statements about Dollar General's business, operations, and

prospects, were false and misleading and/or lacked a reasonable basis.

**The Truth Begins to Emerge**

38.     On August 25, 2016, Dollar General issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the second fiscal quarter ended July 29, 2016 ("Q2 2016 Press Release"). For the quarter, the Company reported a net income of $307 million, or $1.08 per diluted share, compared to a net income of $282 million in the previous year's comparable quarter. The May 2016 Press Release also touted that the Company had increased same-store sales by 0.7% during the fiscal quarter. The press release stated in relevant part:

**Dollar General Reports Second Quarter 2016 Financial Results**

- **Net Sales Increased 5.8%;** *Same-Store Sales Increased 0.7%*
- **Diluted Earnings Per Share Increased 14% to $1.08; Year to Date Through the Second Quarter, Diluted**
- **Earnings Per Share Increased 18% to $2.11**
- **Cash From Operations Increased 36% Year to Date Through the Second Quarter**
- **$597 Million of Capital Returned to Shareholders Year to Date Through the Second Quarter**
- **Board of Directors Approves Incremental $1.0 Billion Share Repurchase Authorization; Declares Third**
- **Quarter 2016 Dividend**
- **Confirms 2016 Full Year Diluted EPS Guidance of 10% to 15% Growth**

GOODLETTSVILLE, Tenn.--(BUSINESS WIRE)--August 25, 2016--Dollar General Corporation (NYSE: DG) today reported financial results for its fiscal 2016 second quarter (13 weeks) ended July 29, 2016.

*"We are pleased with our 2016 second quarter diluted earnings per share growth of 14 percent over the 2015 second quarter, although our same-store sales performance fell short of our expectations. Retail food deflation and a reduction in both SNAP participation rates and benefit levels, coupled with unseasonably mild spring weather, proved to be stronger than expected headwinds to our business.* The competitive environment also intensified in select regions of the country. Importantly, even amidst a challenging sales environment, we effectively managed our gross profit margin and leveraged our selling, general and administrative expense as a percent of sales," said Todd Vasos, Dollar General's chief executive officer.

13

"For the second half of the year, we have action plans across both merchandising and store operations intended to drive same-store sales while maintaining strict expense control discipline. Looking ahead, we remain focused on our long-term strategy to invest for growth while also returning cash to shareholders through consistent share repurchases and anticipated quarterly dividends."

### Second Quarter 2016 Highlights

The Company's net income was $307 million, or $1.08 per diluted share, in the 2016 second quarter, compared to net income of $282 million, or $0.95 per diluted share, in the 2015 second quarter.

Net sales increased 5.8 percent to $5.39 billion in the 2016 second quarter compared to $5.10 billion in the 2015 second quarter. *Same-store sales increased 0.7 percent driven primarily by an increase in average transaction amount offset by a decline in traffic. Same-store sales increases were driven by positive results in the consumables category accompanied by results in the seasonal category that were flat when compared to the 2015 second quarter, offset by negative results in the apparel and home categories.* The net sales increase was also positively affected by sales from new stores, modestly offset by sales from closed stores.

Gross profit, as a percentage of net sales, was 31.2 percent in the 2016 second quarter, an increase of 2 basis points from the 2015 second quarter. The gross profit rate increase was primarily attributable to higher initial inventory markups and lower transportation costs, partially offset by higher markdowns, a greater proportion of sales of consumables merchandise, which have a lower gross profit rate than non-consumables merchandise, and increased inventory shrink.

Selling, general and administrative expense ("SG&A") as a percentage of net sales was 21.7 percent in the 2016 second quarter compared to 21.8 percent in the 2015 second quarter, a decrease of 8 basis points. The SG&A decrease was primarily attributable to lower administrative payroll, advertising, and incentive compensation expenses. Partially offsetting these items were retail labor and occupancy costs, each of which increased at a rate greater than the increase in net sales.

The effective income tax rate was 36.8 percent for the 2016 second quarter compared to a rate of 38.0 percent for the 2015 second quarter. The effective income tax rate was lower in the 2016 second quarter due primarily to the recognition of additional amounts of the Work Opportunity Tax Credit ("WOTC") in the 2016 second quarter. The December 2015 reenactment of the WOTC allowed the Company to receive credits for eligible employees hired during the second quarter of 2016. By comparison, in the 2015 second quarter, only a limited number of employees (hired on or before December 31, 2014) were eligible for the credit.

Emphasis added.

      39.      The same day, during a conference call to discuss the Company's financial and

operating results for the second fiscal quarter ended July 29, 2016, Vasos, stated in relevant part:

**Todd Vasos:**

Thank you, Mary Winn, and welcome to everyone joining our call. For the second quarter, we are pleased with our double-digit earnings per share growth even as our same-store sales performance fell short of our expectations.

*      *      *

***Key factors that negatively impacted our expected same-store sales performance included***, a greater than anticipated headwind from price deflation across key perishable items with retail prices down about 8% for milk and over 50% for eggs, our two largest products within perishables.

***Second a reduction in both SNAP participation rates and benefit levels,*** third an unseasonably mild spring and lastly an intensified promotional environment in select regions of the country**.**

***We estimate that the headwinds from price deflation and the reduction in SNAP benefits negatively impacted our same-store sales for the second quarter by approximately 60 to 70 basis points.***

As I will discuss in more detail later in the call, we are taking aggressive action across merchandizing and store operations to address these factors and help drive same-store sales. And we will continue to be very disciplined in our SG&A spending."

*      *      *

**Paul Trussell:**

Okay, I guess, just going back to the comp, just wanted to - so no guidance in terms of the comp over the balance of the year. Could you maybe just speak to the cadence of comps during the second quarter and *the impact that you mentioned of 60 to 70 basis points from deflation in SNAP, do you expect that a similar impact to be ongoing?*

**Todd Vasos:**

Yes, Paul, I would tell you that all theories in the second quarter were positive. So we are very happy to have seen that. As I look forward to the back half of the year, I believe many if not most all of the same headwinds we saw on the sales line continue to be there in the back half of the year.

***Deflation as well as SNAP that 60 to 70 basis points is a headwind that is not going to go away.*** Now, trying to counter that obviously will be our price investments. Now as you know though, price investments they kind of resonate with the consumer and

while we are very confident that it will drive units and traffic it will take a little time for that initiative to take hold."

*    *    *

**Dan Wewer:**

Just one other follow-up the drop in customer transactions per store, I believe that just the first time that's happened since the buyout back in 2008. Where do you think that that business shifted? Was it to the mass merchants and perhaps they are able to take advantage of the lower gasoline pricing and their customers becoming more mobile as a result?"

**Todd Vasos:**

When we look at it, *the headwind of SNAP for us really was a big deal and also our core consumer continues to be under a lot of pressure*. I know that, when we look at globally, the overall US population, it seems like things are getting better but when you really start breaking it down.

And you look at that core consumer that we serve on the lower economic scale that's out there that demographic, things have not gotten any better for her and arguably they are worse and they are worse because rents are accelerating, healthcare is accelerating on her at a very, very rapid cliff and now, *you couple that upwards of 20 states where they have reduced or eliminated the SNAP benefit and it has really put a toll on her.*

*That SNAP benefit reduction and/or elimination have begun in April, right that was a kick off and you could see it immediately in the numbers*. So I believe that those are the things that are affecting her today again, our core customers and by the way, we've seen those play out before.

*If you dwell the prospects of October of 2013 and coming into November of 2013 when the last large SNAP benefit reduction happened it happened almost exactly the same way on our comps and how we thought traffic. Obviously, we are up a little higher level at that time, but rest assured that our traffic slows tremendously then very similar as it did now.*

Emphasis added.

40.     On the release of the news, the Company's share price declined $16.18 per share, or approximately 17.6%, from a closing price of $91.79 per share on August 24, 2016, to close at $75.61 per share on August 25, 2016, on extremely heavy volume.

41.     The statements in paragraphs 38-40 above were false and/or misleading as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.

Specifically, these statements were false and/or misleading statements and/or failed to disclose that (i) that reinstitution of time limits on SNAP benefits would impact Dollar General's operating business and financials more than Defendants had previously disclosed, particularly on the Company's fiscal 2016 EPS guidance and same-store growth estimates; (ii) 56 percent of Dollar General stores are located in states that re-implemented the time limitation on SNAP benefits; (iii) the announced benefit reductions would have a disproportionate impact on the Company's sales relative to the overall percentage of sales derived from SNAP payments; and (iv) as a result of the foregoing, the Company's financial statements, as well as Defendants' statements about Dollar General's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

### The Truth is Revealed

42. Before the market opened on December 1, 2016, Dollar General issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the third fiscal quarter and nine month ended October 28, 2016 ("Q3 2016 Press Release"). For the quarter, the Company reported a net income of $253 million, or $0.84 per diluted share, compared to a net income of $253 million, or $0.86 per diluted share in the previous year's comparable quarter. The press release stated in relevant part:

> GOODLETTSVILLE, Tenn.--(BUSINESS WIRE)--December 1, 2016--Dollar General Corporation (NYSE: DG) today reported financial results for its fiscal 2016 third quarter (13 weeks) ended October 28, 2016.
>
> ***"The challenging retail environment that we experienced in the 2016 second quarter continued into the third quarter, contributing to weakness in our same-store sales and our financial performance***. In the 2016 third quarter, we invested in gross margin with the goal of driving traffic and sales over time. Many of these actions are gaining traction with our core customers, and we are encouraged by the early results. As expected, the full benefit on our same-store sales will not be immediate. ***In addition, we saw an acceleration in headwinds from average unit retail price deflation and reductions in SNAP benefits in the 2016 third quarter as compared to the 2016 second quarter.*** We are focused on efforts to drive traffic in our stores and to control the factors we can control as we look to overcome the issues

17

impacting our results, many of which we believe are macroeconomic and transitory in nature," said Todd Vasos, Dollar General's chief executive officer.

"We continue to believe that our business model is strong given our value proposition to our consumers. We are investing in accelerated new store growth with excellent returns, as well as the infrastructure to support this growth, while continuing to return cash to shareholders."

### Third Quarter Highlights

The Company reported net income of $235 million, or $0.84 per diluted share, in the 2016 third quarter, compared to net income of $253 million, or $0.86 per diluted share, in the 2015 third quarter.

Net sales increased 5.0 percent to $5.32 billion in the 2016 third quarter compared to $5.07 billion in the 2015 third quarter. Same-store sales decreased 0.1 percent from the 2015 third quarter primarily due to a decline in traffic partially offset by an increase in average transaction amount. Same-store sales were driven by positive results in the consumables category offset by negative results in the seasonal, apparel and home products categories.

The net sales increase was positively affected by sales from new stores, modestly offset by sales from closed stores.

*     *     *

### Financial Outlook

On March 10, 2016, the Company stated that it intended to update its diluted EPS guidance for the 53-weeks ending February 3, 2017 ("fiscal 2016") only if the Company no longer reasonably expects diluted EPS to fall within the 10 percent to 15 percent range outlined in the long-term growth model included in its press release issued on that date. ***The Company now forecasts diluted EPS growth for fiscal 2016 to be at the low end of the Company's long-term growth model range of 10 percent to 15 percent.*** The Company expects the 53rd week to contribute approximately 200 basis points to its net sales performance and continues to estimate a $0.09 per diluted share impact to EPS.

Emphasis added.

43.     The same day, during a conference call to discuss the Company's financial and operating results for the third fiscal quarter and nine-months ended October 28, 2016. During the call, Dollar's CEO Vasos stated in relevant part:

**Todd Vasos:**

As the deflation cycle continues in the quarter, we have re-evaluated how we're looking at the impact ultimately taking a more broad based view. Rather than limiting our view to commodity cost of milk and eggs, we expanded our analysis to the average unit retail price deflation. Applying this broader view of deflation to both our second and third quarters, we experienced a greater impact in the third quarter as compared to the second quarter. ***We estimate that the combined headwinds from the average unit retail price deflation and reduction in SNAP benefits negatively impacted our same-store sales for the third quarter by approximately 150 to 175 basis points and for our second quarter by approximately 100 to 115 basis points***. We believe many of these issues are transitory in nature.

\*       \*       \*

**Alison Levens:**

Great, thanks, very helpful. And then just as a follow-up, ***can you provide more detail regarding what changed with respect to the SNAP headwinds in 3Q versus 2Q?***

**Todd Vasos:**

Yes, you know, when we look at it -- it was about the same. ***When we look at our SNAP affected states, I'll give you a little color; really what's interesting here is a lot like Q2, Q3 was pretty close to about the same but if you look at it, it affects about 56% of our store base in the states that have reduced or eliminated the SNAP benefit and those states that have -- that have had the reduction or elimination, they are approximately a 100 basis points worse than comp. That gives you a real good idea of how impactful those SNAP benefits -- reductions have been.*** Again, we feel it's transitory, we'll move through that as we move through 2017 but right now that's why we've really taken a real hard look at reducing prices for those core consumers, especially given around those states because they need this right now based on what we see.

Emphasis added.

44.    On this news, Dollar General stock price declined $3.84, or nearly 5%, from a close of $77.32 per share on November 30, 2016, to close at $73.48 per share on December 1, 2016.

## SCIENTER ALLEGATIONS

45.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the

19

investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Dollar General, their control over, and/or receipt and/or modification of Dollar General's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Dollar General, participated in the fraudulent scheme alleged herein.

## ADDITIONAL SCIENTER ALLEGATIONS

46. On March 25, 2016, Dollar General held its 2016 Investor Day during which Dollar General's Executive Vice President and Chief Merchandising Officer Jim Thorpe recognized that the impact of no cost of living increases for its SNAP recipient customers and also touted the Company's "deep and actionable understanding of our customers." Jim Thorpe stated in relevant part:

> ***There were no cost of living increases this year and that particularly hurts our SNAP and Social Security recipients especially hard***. And healthcare costs and rents continue to rise which also impacts our customers more than higher income households. This has resulted in the majority of Americans living on the bubble of economic uncertainty. 60% of Americans don't have a savings safety net of $1000 and 20% don't have a savings account at all. So as you will see, our customers simply haven't received the benefit of the economic recovery***.***
>
> *       *       *
>
> ***So one of Dollar General's core strengths is our deep and actionable understanding of our customers. We know who they are, where they shop, how they shop, what they buy, how much they spend but more importantly we know their attitudes and their behaviors. And we get this through our integrated and actionable customer segmentation process.*** Now this knowledge is certainly at the core of our category management process and it drives all of our merchandising and pricing decisions but it also guides decisions across our entire organization including how we market and brand to our customers, how we design stores and in our site selection and actually how we operate our stores each and every day. ***And we recently re-segmented our customers which is the first re-segmentation we've done since 2012 and it's based on a trip projection methodology that Nielsen is piloting in their Homescan panel and it provides a much more accurate representation of our customer spending and***

20

Case 3:17-cv-00276     Document 1     Filed 02/13/17     Page 20 of 31 PageID #: 20

*significantly improves our customer insights.* Now Dollar General is the very first retailer in America to launch customer segmentation using this new trip projection methodology.

*Now in 2016, our new re-segmentation, we have three BFFs -- Tiffany, Sylvia and Virginia -- now representing 34% of shoppers and 66% of sales but still only earn $40,000 a year. Very budget conscious but many still having to rely on government assistance to get by.* Now they spend about $774 a year with us, shop us three times a year and when they shop they spend about $20.

Emphasis added.

47.     This information further supports a finding Defendants knew or recklessly disregarded information concerning the forthcoming effects of the re-institution of the time limitation on SNAPS benefits and/or the impact it would have on the Company and its financials.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Dollar General securities on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

49.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Dollar General securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Dollar General or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  As of November 28, 2016, Dollar General had 276,264,260 outstanding shares of common stock.  Upon information and belief, these shares are held by thousands if not

millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

51.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b)     whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)     whether the price of Dollar General securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION/ECONOMIC LOSS

54.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's securities. As detailed above, when the truth about the materiality of SNAP benefit customers on Dollar General's financials and same-store growth was revealed, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Dollar General's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

55.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Dollar General's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Dollar General's securities to be artificially inflated. Plaintiff and other Class members purchased Dollar General's securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

56.     At all relevant times, the market for Dollar General's common stock was an efficient market for the following reasons, among others:

    (a)    Dollar General's common stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

    (b)    Dollar General communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

    (c)    Dollar General was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

    (d)    Unexpected material news about Dollar General was reflected in and incorporated into the Company's stock price during the Class Period.

57.     As a result of the foregoing, the market for Dollar General's common stock promptly digested current information regarding Dollar General from all publicly available sources and reflected such information in Dollar General's stock price. Under these circumstances, all purchasers of Dollar General's common stock during the Class Period suffered similar injury through their purchase of Dollar General's common stock at artificially inflated prices, and a presumption of reliance applies.

58.     Alternatively, reliance need not be proven in this action because the action involves

24

omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## NO SAFE HARBOR; INAPPLICABILITY OF THE BESPEAKS CAUTION DOCTRINE

59. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

60. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

61. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Dollar General who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## COUNT I

## Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder Against All Defendants

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Dollar General securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

64.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Dollar General securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

65.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Dollar General as specified herein.

66.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course

26

of conduct as alleged herein in an effort to assure investors of Dollar General's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Dollar General and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Dollar General securities during the Class Period.

67.     Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

68.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Dollar General's operating condition and future business prospects from

the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

69. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Dollar General's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Dollar General's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Dollar General's securities during the Class Period at artificially high prices and were or will be damaged thereby.

70. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Dollar General's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Dollar General securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

71. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

72.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

73.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II
### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

74.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.     Vasos and Garratt acted as controlling persons of Dollar General within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Vasos and Garratt had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Vasos and Garratt were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

76.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

77.     As set forth above, Dollar General, Vasos, and Garratt each violated Section 10(b),

and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

78.     By virtue of their positions as controlling persons, Vasos, and Garratt are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

79.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 13, 2017

HOLIFIELD JANICH RACHAL
& ASSOCIATES, PLLC

/s/ Al Holifield
Al Holifield, Esq.
11907 Kingston Pike, Ste. 201
Knoxville, Tennessee 37934
Tel: (865) 566-0115
Fax: (865) 566-0119
Email: aholifield@holifieldlaw.com

*Liaison Counsel*

-and-

Nicholas I. Porritt (*Pro hac vice to be submitted*)
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com

*Attorneys for Plaintiff and proposed counsel for the Class*